1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

2

3    EDGARDO MILLET-SANCHEZ

4        Plaintiff

5        v.                                        CIVIL NO. 96-2052 (JAG)

6    ACAA, et. al.

7        Defendants

8    _____

9                        <u>**REPORT AND RECOMMENDATION**</u>

10         Plaintiff Edgardo Millet Sánchez (hereinafter "Millet") filed the present lawsuit against

11   several co-defendants, including co-defendant Dr. Luis A. González Alonso on August 28, 1996.

12   Plaintiff Millet asserts that co-defendant González Alonso discriminated against him by refusing to

13   provide him with medical treatment because of his disability, thus violating Title III of the

14   Americans with Disabilities Act (hereinafter "ADA").  Plaintiff Millet also brings forth various

15   supplemental state law claims. (<u>See</u> Docket No. 127, Amended Complaint).

16         Co-defendant González-Alonso filed a motion for summary judgment on December 21,

17   2000. (Docket No. 94). A memorandum of law in support of the summary judgment motion and the

18   requisite 311.12 statement were filed on December 27, 2000. (Docket No. 97).  Plaintiff Millet filed

19   his opposition on February 27, 2001. (Docket No. 110).   In addition, plaintiff Millet filed a

20   memorandum of law relative to the issue of his status as a "disabled" individual under the ADA.

21   (<u>See</u> Docket No. 111).  Co-defendant González  filed a reply to plaintiff's opposition on June 5,

22   2001. (Docket No. 131).  The matter was referred for report and recommendation June 29, 2001.

23   (Docket No. 133).

24

25                        <u>**SUMMARY JUDGMENT STANDARD**</u>

26         Rule 56(c), of the Federal Rules of Civil Procedure, sets forth the standard for ruling on

27   summary judgment motions:  The judgment sought shall be rendered forthwith if the pleadings,

28   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

1  **CIVIL NO.96-2052 (JAG)**                                    2

2  show that there is no genuine issue of material fact and that the moving party is entitled to a

3  judgment as a matter of law. Fed. R. Civ. P. 56(c). The critical question is whether a genuine issue

4  of material fact exists. A genuine issue exists if there is sufficient evidence supporting the claimed

5  factual dispute to require a choice between the parties' differing versions of the truth at trial. Morris

6  v. Government Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am.

7  Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). A fact is material if

8  it might affect the outcome of the suit under the governing law. Morrisey v. Boston Five Cents Sav.

9  Bank, 54 F.3d 27, 31 (1st Cir. 1995); Maldonando Denis v. Castillo-Rodríguez, 23 F.3d 576, 581

10  (1st Cir. 1994). On a motion for summary judgment, the court must view all evidence and related

11  inferences in the light most favorable to the nonmoving party. See Springfield Terminal Ry. v.

12  Canadian Pac. Ltd., 133 F.3d 103, 106 (1st Cir. 1997). Nonetheless, the court is free to "ignore

13  'conclusory allegations, improbable inferences and unsupported speculation.'" Súarez v. Pueblo

14  International, Inc., 229 F.3d 49, 53 (1st Cir. 2000) (citing Medina-Muñoz v. R.J. Reynolds Tobacco

15  Co., 896 F.2d 5, 8 (1st Cir. 1990)).

16      In order to aid the court in the daunting task of searching for genuine issues of material fact

17  in the record, this district adopted Local Rule 311.12. See, e.g., Corrada Betances v. Sea-Land

18  Service, Inc., 248 F.3d 40, 43-44 (1st Cir. 2001); Morales v. Orssleff's EFTE, 246 F.3d 32, 33-35

19  (1st Cir. 2001); Ruiz Rivera v. Riley, 209 F.3d 24, 27-28 (1st Cir. 2000). This rule, requires, in

20  relevant part, that a party moving for summary judgment submit, in support of the motion, "a

21  separate, short concise statement of material facts as to which the moving party contends there is no

22  genuine issue to be tried and the basis of such contention as to each material fact, properly supported

23  by specific reference to the record." D.P.R.R. 311.12.

24      It is clearly established in this District that compliance with Local Rule 311.12 is critical,

25  given that the Court will only consider the facts alleged in the aforementioned 311.12 statements

26  when entertaining the movant's arguments. See Rivera de Torres v. Telefónica de Puerto Rico, 913

27  F.Supp. 81, 85 (D.P.R. 1995). In the instant case, both parties have failed to fully comply with the

28  requirements of Local Rule 311.12, given that there are multiple statements of fact that have no

specific reference to the record. Without specific references to the record the list of uncontested

1 **CIVIL NO.96-2052 (JAG)**                3

2 facts is worthless, given that "[t]he Court [is forced] to continue to ferret through the record, read

3 all the answers to the interrogatories, study all the attached documents, and carefully scrutinize all

4 the depositions for lurking genuine issues of material fact." Dominguez v. Eli Lilly & Co., 958

5 F.Supp. 721, 727 (D.P.R. 1997)(citing Stepanishen v. Merchants Despatch Transp. Corp., 722 F.2d

6 922, 930-931 (1st Cir. 1983).

7           In view that the parties, in particular the plaintiff, did not fully comply with the requirements

8 of Local Rule 311.12, the Court will outline *only* the relevant facts of the case in the light most

9 favorable to plaintiff Millet, based *solely* on those facts that contain references to the record.   The

10 court has also considered the  relevant facts with references to the record contained in plaintiff's

11 motion in opposition to co-defendant Dr. Santiago Ponce's Motion for Summary Judgment (Docket

12 No. 74), given that plaintiff sought to incorporate those facts by reference and some of them were

13 relevant to Millet's mental condition.

14

15                                **FACTUAL BACKGROUND**

16 *I.  Plaintiff Millet's mental condition:*

17           Mr. Millet's mental condition arose out of a work related accident in 1986 while working

18 as a cook at Aurorita's Restaurant.  (Docket No. 97, Millet's deposition of 1-27-01, p. 44)[1].  He

19 received treatment for his mental condition on an ambulatory basis for three years at the Medical

20 Health Clinic in Bayamón's Regional Hospital. (Id. at 42).  Plaintiff Millet opted to stop his

21 psychiatric treatment at the Medical Health Clinic in Bayamón, and instead  began a relationship

22 with a private psychiatrist,  Dr. José Vázquez Sotomayor, on or about 1993. (Id. at 56; see also,

23 Docket No. 110, Vázquez's deposition, p. 30).[2]

24

25 —————————————

26           [1]      The entire transcript of plaintiff Millet's depositions, to which both parties make
multiple references in their 311.12 statements, is found at Docket No. 71, which is co-defendant Dr.
27 Santiago Ponce's motion for summary judgment.

28

           [2]      Once again, the parties' 311.12 statements make references to Dr. Vázquez
Sotomayor's deposition, which can be found in its entirety at Docket No. 71.

1    **CIVIL NO.96-2052 (JAG)**                4

2         Mr. Millet has been diagnosed as having chronic paranoid schizophrenia and schizo-affective

3    disorder.[3]   Paranoid schizophrenia is psychotic illness in which a patient believes that the world

4    wants to hurt him: the patient suffers from visual and auditory hallucinations, has attention

5    problems, believes he is being persecuted, and at times is disoriented and outside reality. (Vázquez's

6    deposition, p. 19).   In addition, plaintiff Millet is said to suffer from agoraphobia, a condition

7    whereby a person feels apprehensive about crowds or places. (Id. at 24). According to Dr. Vázquez,

8    plaintiff Millet experiences high anxiety when surrounded by people, in crowded places and cannot

9    wait under these conditions. (Id. at 80-82).

10        After Millet's first visit with Dr. Vázquez in May of 1993, he was prescribed Prozac, Xanax

11   (anxiolitic), Aldol (anti-psychotic), Restoril (hymnotic), and Pamelor (anti-depressant). (Id. at 27,

12   38-39). By July 1993, Dr. Vázquez recommended that plaintiff Millet be hospitalized through the

13   State Insurance Fund (Id. at 27-28), and referred Mr. Millet to be hospitalized at Mepsi Center. (Id.

14   at 44). By 1995, Dr. Vázquez's diagnosis of plaintiff Millet had not changed; thus Millet continued

15   taking the anti-psychotic drug Aldol or Risperdal,as well as Xanax, Dalmane and Pamelor. (Id. at

16   56). By 1996, Dr. Vázquez diagnosed Mr. Millet with schizo-affective disorder, and thus ordered

17   him to continue with his medications. (Id. at 70). By early 1996, Millet began to present symptoms

18   related to both, affective disorders and schizophrenia. (Id.  at 73).  Dr. Vázquez has stated that a

19   patient like Millet, who is psychotic and suffers from hallucinations, de-personalization and schizoid

20   states, may not necessarily have an altered perception of reality.  Sometimes he does; sometimes he

21   does not. (Id. at 79).

22        Dr. Vázquez's medical records show that in 1997, 1998, 1999 and 2000, Mr. Millet

23   experienced severe psychosis, severe depression, severe insomnia, and severe anxiety. (Docket No.

24   110, Exhibit 5, Dr. Vázquez's medical records). The Social Security Administration rendered Millet

25   totally disabled to work because of "primary diagnosis of schizophrenia, paranoia and other

26   _____

27

28        [3]     Schizo-affective disorder is a mental illness that presents schizoid symptoms such
     as hallucinations, de-personalization, schizoid states, and de-realizations. (Docket No. 110, Dr.
     Vázquez's deposition, p. 16). Schizo-affective disorder is like a mix of both schizophrenia and
     major depression. (Id. at 18).

1  **CIVIL NO.96-2052 (JAG)**                5

2  psychotic disorders." (Docket No. 110, Exhibit 6).

3  *II. The car accident and the subsequent ACAA referrals:*

4    On August 28, 1995, Millet was involved in a car accident. After the accident, he was taken

5  to the Bayamón Regional Hospital were he was X-rayed and a cast was placed on his right leg. In

6  addition  he was given ACAA's papers so that he would go to said agency the next Monday.

7  (Millet's deposition of 2-9-00 at p. 91). At ACAA he was referred to Dr. Rufino Montañez (Id. at

8  119). According to plaintiff Millet, Dr. Montañez sent ACAA a note  including his diagnosis, the

9  need for emergency surgery, and the fact that Millet had an  emotional condition which needed to

10  be taken into account. (Millet's deposition of  2-10-00 at 44). It appears form the record that Millet

11  returned to ACAA for various reasons: (1) because Dr.  Montañez explained to him that he could

12  select a physician form the list provided by ACAA (Millet's  deposition of 2-10-00 at 44-45); (2)

13  because  he had a crisis at the office of Dr. Montañez and the doctor understood that plaintiff's

14  emotional crisis required special attention (Id. at 48); and, (3) because Dr. Montañez operated his

15  patients at  Bayamón Regional Hospital and that location was inconvenient for plaintiff and his

16  family. (Id. at 49). After going back to ACAA, plaintiff Millet  was referred to  Dr. González

17  Alonso, the co-defendant in the present lawsuit.

18  *III. The encounter at Dr. González Alonso's office:*

19    Dr. González Alonso, a  physician with a specialty in the field of orthopaedics, has

20  maintained a contractual relationship with ACAA since 1986. (Docket No. 97,  González's

21  deposition, pgs. 6, 9). As previously mentioned, on or about September 11, 1995, ACAA referred

22  plaintiff Millet to the offices of Dr. González for treatment. (Id. at  pg. 9). Dr. González's first

23  encounter with plaintiff Millet occurred after hearing a commotion outside his office, and being told

24  by his secretary that there was a patient  demanding to be seen before the other patients, allegedly

25  because he could not be surrounded by people.[4] Dr. González proceeded to instruct his secretary to

26  _____

27

28    [4] It appears that upon arriving at Dr. González's office Millet was told to place his name on the list and wait in the crowded waiting area. Millet then stated to the doctor's staff that he wanted to be treated differently because he suffered from agoraphobia and eventually entered into a crisis and locked himself in the bathroom.  He was then told to come out because  the doctor

CIVIL NO.96-2052 (JAG)                        6

2  let plaintiff Millet into his office. (Id. at 31). Upon questioning by Dr. González, plaintiff Millet

3  explained that he was disabled due to a nervous condition, and he could not tolerate being

4  surrounded by people. (Id. at 33). Dr. González alleges that the reason why he called plaintiff

5  Millet into his office was to establish if indeed he needed to be accommodated before the rest of the

6  patients who had been waiting for a longer period of time. In fact, Dr. González admits that after

7  reviewing the relevant information he had reason to believe that plaintiff Millet was correct in

8  demanding a special accommodation. (Id. at 36 and 51).

9       Dr. González was able to ascertain from plaintiff's records that Dr. Montañez, who had

10  seen plaintiff Millet on September 1, 1995, had concluded that Millet suffered from a right ankle

11  displaced fracture and that his right leg needed orthopedic surgery. (Id. at 47- 48). After speaking

12  with Millet, Dr. González concluded that he was unable to treat the plaintiff because he was afraid

13  that he would not be able to control him after a surgical procedure, especially in light of the

14  likelihood that he had a displaced fracture, as Dr. Montañez had noted in his report. (Id. at p.52-

15  53). Dr. González told Millet that, in his opinion, he would be better served by going to a multi-

16  disciplinary center, such as the Puerto Rico Medical Center, where there would be multiple

17  specialists on a full time basis to serve his special needs. (Id. at 53).

18       Dr. González did not physically examine Millet. Nonetheless, as a result of his conversation

19  with the plaintiff and the revision of his medical documents, Dr. González proceeded to inform

20  ACAA that Millet's orthopaedic condition was related to a car accident. (Id. at 57, 61). In his

21  personal progress notes, Dr. González wrote that Millet was a psychiatric patient in need of

22  psychiatric follow-up while in the hospital, and that he agreed with Dr. Montañez's determination

23  that the patient be referred to the Bayamón Regional Hospital. (Id. at 64, 81 and 84). He further

24  noted that Millet did not take any medication nor had x-rays available. (Id. at 64). Dr. González did

25  not bill ACAA for his services since he had decided that he could not treat the patient. (Id. at 69).

26       ACAA then referred Mr. Millet to Dr. César Cintrón Valle on October 2, 1995. (Cintrón's

27  deposition, p. 15). Personnel form ACAA spoke with Dr. Cintrón and in general terms explained

28  ––––––––––––––––––

would see him. (Millet's deposition of 2-10-00 at p. 56; Marta Rodríguez's deposition of 5-22-00
at p. 40).

1 **CIVIL NO.96-2052 (JAG)**                    7

2 that Millet needed medical attention; that he was suffering from a nervous condition and was unable

3 to wait for treatment; and, that they needed to know whether he could see him and evaluate him

4 promptly. (Id. p. 16). Finally, plaintiff Millet's fractured foot was operated by Dr. Cintrón at the

5 Hospital San Francisco.

6 *IV.* *Facts about plaintiff Millet's condition of agoraphobia and its effect on his daily life activities*

7       Throughout his extensive deposition, Mr. Millet repeatedly testified about the symptoms of

8 his psychiatric condition, and how his symptoms allegedly limit and hamper his capacity to live

9 without breaking into an emotional crisis, to work, to relate to others and to function on a daily basis.

10 However, plaintiff Millet makes scant and generalized statements about how his mental condition

11 affect his daily activities. Moreover, several of his 311.12 statements, even lack appropriate

12 references to the record.

13       Plaintiff Millet alleges that his ability to deal with people is severely limited by his mental

14 condition. It is Millet's contention that he has been forced to look for work alternatives where he

15 does not have to deal with the public. Mr. Millet expressed: "People bother me." Since I cannot

16 work for anyone, I breed Yorkies in my house." (Docket No. 74, Exhibit 20). Mr. Millet derives

17 income from breeding his dogs: a female and male Yorkies. (Docket No. 74, Exhibit 21).[5] Mr.

18 Millet also provides catering and buffet services ( Docket No. 74, Exhibit 22); but he is only able

19 to do so when his mental health is "stable."[6] Millet states that when he is not stable "he cannot

20 even deal with his dogs". (Docket No. 74, Exhibit 22).

21       Mr. Millet stated in his deposition that he is limited by his symptoms of agoraphobia on

22 a daily basis. Sometimes it even limits his ability to go to his home's patio. (Docket No. 74, Exhibit

23 23). He further states that even when medicated he suffers symptoms. (Docket No. 74, Exhibit 24).

24 ———————————————

25

26     [5]    Even though plaintiff Millet's 311 statement included in Docket No. 74, it is mentioned that this breeding business is plaintiff's *one* source of income, a reading of plaintiff's

27 deposition reveals that this statement is incorrect and misleading.

28     [6]    Mr. Millet is not personally present at the place where catering services are offered. He does not personally supervise the activity. He shows up at the site to receive payment. (Docket No. 74, Exhibits 22 and 23).

CIVIL NO.96-2052 (JAG)                    8

Therefore, his wife takes care of a lot of things. (Id.). Millet further stated that of all the conditions he suffers, agoraphobia has been the hardest to deal with due to the confinement, the feeling of isolation, the phobia about people, and the panic attacks he suffers when he around people. (Docket No. 74, Exhibit 28).

Mr. Millet alleges that his capacity to use public transportation is limited by his psychiatric condition; thus his parents and friends take him to his medical appointments. Millet has stated that he can use public transportation when medicated, but that sometimes the medication may not prevent him from suffering from symptoms. "Sometimes I have to get off [public transportation] in the middle of the way and keep walking, no matter where I am going." ( Docket No. 74, Exhibit 35). Even though Mr. Millet had a drivers license he cannot drive when medicated. (Docket No. 74, Exhibit 36). However, Millet has been able to drive in the continental United States because the "roads are wider, there is less noise, less things to increase [his] stress level." (Docket No. 74, Exhibit 36 and 37). Mr. Millet is committed to taking his medication. (Docket No. 74, Exhibit 38).

## DISABILITY UNDER THE ADA

Title III of the American with Disabilities Act ("ADA"), which prohibits discrimination on the basis of disability in public accommodations operated by private entities, was enacted primarily to facilitate disabled individuals' access to such places. See, e.g., DeBord v. Board of Educ. of Ferguson-Florissant Sch. Dist., 126 F.3d 1102, 1106 (8th Cir. 1997), cert. denied, 523 U.S. 1073 (1998). The Act reads as follows:

> No individual shall be discriminated against on the basis of disability, in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). See also, Montalvo v. Radcliffe, 167 F.3d 873, 876 (4th Cir. 1999). To establish liability under this section, plaintiff Millet must prove that he: (1) has a disability; (2) was discriminated against on the basis of that disability; (3) was thereby denied goods or services; (4) by a place of public accommodation by the owner or operator of that facility. See Sharrow v.

**CIVIL NO.96-2052 (JAG)**                    9

Bailey, 910 F.Supp.187, 191 (M.D. Pa. 1995). The "professional office of a health care provider"

is considered a "place of public accommodation" under Title III of the ADA. See 42 U.S.C. §

12181(7)(F).

      The ADA defines "disability" as follows:

> (A) *a physical or mental impairment that substantially limits one or more of the major life activities of such individual;*
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2)(emphasis ours). Plaintiff has not alleged in any of his motions opposing

defendants' motions for summary judgment that he has a record of impairment, or that he was

regarded by others as having an impairment. Rather, Millet suggests that he is disabled because he

has a mental impairment that substantially limits a major life activity. Defendant, Dr. González, in

turn,  argues that plaintiff Millet has not set forth enough proof that he is disabled within the

meaning of the ADA.

      "The determination of whether an individual is disabled under the ADA is made on an

individualized, case-by-case basis." Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144,

151 (2nd Cir. 1998). The Supreme Court has discussed the three requirements that plaintiff must

fulfill to show that he is "disabled" under the ADA.[7] See Bragdon v. Abbott, 524 U.S. 624, 632-

939 (1998). See also Bercovitch v. Baldwin School, Inc., 133 F.3d 141, 155 (1998) . First, plaintiff

Millet must have a "physical or mental impairment". Id. at 632. Second, Millet must assert that a

---

[7]    EEOC  regulations provide additional guidance regarding the interpretation of the three main components of the term "disability": "physical or mental impairment," "substantially limits," and "major life activities."  See Sutton v. United Air Lines, 527 U.S. 471, 479-80 (1999)(discussing 29 C.F.R. § 1630.2(h)-(j)). A "mental impairment" includes "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). The EEOC construes the phrase "substantially limits" to mean that the person is: "(i) unable to perform a major life activity that the average person in the general population can perform; or  (ii) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §1630.2(j)(1).

CIVIL NO.96-2052 (JAG)                    10

"major life activity"[8] is affected by the impairment. Id. at 637. Third, the impairment must be "a substantial limit on the major life activity [plaintiff Millet] asserts." Id. at 639. When considering these factors, the Court must also make reference to corrective measures, such as medication. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 488 (1999). Whether a plaintiff has a disability under 42 U.S.C. § 12102(2)(A) must be evaluated by taking into account any mitigating measures available to plaintiff. See Taylor v. Phoenixville School District, 184 F.3d 296, 302 (3rd Cir. 1999).

The parties do not dispute, and the Court does not see any reason to question, that plaintiff Millet's ailments (Chronic Paranoid Schizophrenia, Schizo-affective Disorder, and Agoraphobia) constitute "mental impairments" for purposes of the ADA. See, e.g., Reeves v. Johnson Controls World Services, 140 F.3d at 150 (agoraphobia constitutes a "mental impairment" for purpose of the ADA). The contested issue is whether Millet's mental impairments "substantially limit" one or more "major life activities." 42 U.S.C. § 12102(2).

In determining whether plaintiff's impairment substantially limits a major life activity, the Supreme Court has stressed that courts should "determine the existence of disabilities on a case-by-case basis." Albertsons, Inc. v. Kirkingburg, 527 U.S. 555, 566 (1999). To make this individualized assessment, the Court must first identify the specific life activity or life activities which are "substantially limited" by plaintiff Millet's mental disorders.[9] In his opposition to co-defendant

_____

[8]  "Major life activit[ies]" include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." See 28 C.F.R. § 35.104. See also Reeves v. Johnson Controls World Servs., Inc., 140 F.3d at 150.

[9]  See, e.g., Lawson v. CSX Transportation, Inc., 245 F.3d 916, 924-926 (7th Cir. 2001)(there was enough evidence in the record from which a jury could find that plaintiff, who had diabetes, was substantially limited in his ability to fulfill the major life activity of eating). See also Reeves v. Johnson Controls, Inc., 140 F.3d at150 (plaintiff's panic disorder with agoraphobia did not qualify under the ADA, as plaintiff failed to demonstrate that such condition substantially limited a major life activity); Bercovitch v. Baldwin School, Inc., 133 F.3d at1 55-56 (plaintiff, who suffered from a learning disability, "ADHD", failed to meet his burden of showing that his condition substantially limited a major life activity); Roberts v. New York Dept. of Correctional Services, 63 F.Supp.2d 272, 285 (W.D. New York 1999)(plaintiff failed to demonstrate that his condition of alcoholism substantially interfered with a major life activity and thus failed to establish a prima facie case of discrimination under the ADA).

1  **CIVIL NO.96-2052 (JAG)**                    11

2  González's motion for summary judgment, plaintiff Millet has failed to mention with specificity

3  which particular life activity is substantially limited by his mental impairments. Millet tends to

4  make a generalized claim that his entire life is affected by his condition. A very favorable

5  interpretation of Millet's motions might suggest that he is limited by his mental disorder in his

6  ability to work and in his ability to be in places were there are lots of people. The court has not been

7  able to find case law, nor the plaintiff points to any, were the ability to be in a place were there are

8  lots of people is considered to be a major life activity.[10]

9        The issue of whether Millet's ability to work is limited by his mental disorders has been

10  somewhat discussed in the record. True enough, the record suggest that Millet can not perform some

11  jobs, and in fact he was found to be disabled by the Social Security Administration.[11] However,

12  there is ample evidence in the record, which Millet does not contest, suggesting that he indeed works

13  both as a dog breeder and managing a catering service. In the instant case, plaintiff Millet has failed

14  to present any specific evidence from which a jury could possibly find that his impairment

15  substantially limits one or more major life activities. The conclusory allegations and generalized

16  statements made by plaintiff Millet as to difficulties which he endures as a consequence of his

17  condition are not sufficient to survive co-defendant González's motion for summary judgment.[12]

18        Given that the Court finds that plaintiff Millet has not set forth evidence in support of his

19  contention that he is a "disabled individual" under the ADA, the collateral matters of whether Millet

20  was taking his medication thus mitigating the effects of his symptoms, and of whether Dr. González

21  _____

22

23        [10]    In fact, the only similar life activity that the court has been able to ascertains is that
    of having relationships with other people, i.e., socialization. However, not only is there case law
24  casting doubt as to whether socialization can be considered a major life activity under the ADA, (see
    Herscheft v. The New York Bd. of Elections, 2001 WL 940923 (E.D.N.Y. 2001)), but plaintiff
25  Millet is married as has failed to present evidence suggesting that he is unable to socialize and/or
26  relate to others.

27

28        [11]    The record is not clear as to when exactly was the determination of disability made
    by the SSA. In fact, the record suggest that this determination was made after the incident leading
    to this lawsuit.

1  **CIVIL NO.96-2052 (JAG)**                    12

2  was justified in referring him to some other physician due to his alleged inability to deal with a

3  patient with severe emotional complications (see, e.g., <u>Lesley v. Hee Man Chie, M.D.</u>, 250 F.3d 47,

4  53-54 (1st Cir. 2001)) warrant no further discussion.

5                               **<u>CONCLUSION</u>**

6          In view of the aforementioned, this Court recommends that co-defendant González's motion

7  for summary judgment (Docket No. 94) be **GRANTED**.  Plaintiff Millet's ADA claims and his

8  supplemental law claims against the co-defendant should be **DISMISSED** in their entirety.

9          Under the provisions of Rule 510.2, Local Rules, District of Puerto Rico, any party who

10 objects to this report and recommendation must file a written objection thereto with the Clerk of the

11 Court within ten (10) days of the party's receipt of this report and recommendation . The written

12 objection must specifically identify the portion of the recommendation, or report to which objection

13 is made and he basis for such objections. Failure to comply with this rule precludes further appellate

14 review. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Davet v. Maccorone</u>, 973 F. 2d 22, 30-31

15 (1st Cir. 1992).

16         At San Juan, Puerto Rico this 3rd day of January, 2002.

17

18

19

20

21                                    GUSTAVO A. GELPI
                                      United States Magistrate-Judge
22         s/cs:to ( ⌀ )

23         attys/pts
           in ICMS
24

25         JAN - 8 2002

26

27

28